1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GREGORY TABAREZ,

        Plaintiff,                No. CIV S-04-0360 LKK EFB P

    vs.

DIANA BUTLER, et al.,

        Defendants.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Plaintiff is a prisoner without counsel suing for alleged civil rights violations. *See* 42 U.S.C. § 1983. This action proceeds on the January 25, 2006, first amended complaint. The matter is now before the court on defendants' May 30, 2007 and June 4, 2007, motions for summary judgment. For the reasons explained below, the motion must granted, in part, and denied, in part.

        Plaintiff claims in his verified amended complaint that defendants violated his right to be free from cruel and unusual punishment. In particular, he alleges the following: (1) that defendants Acuna, Baber, Bunnell, Butler, Lemon and Rendon[1] were deliberately indifferent to his safety by conducting conducted an unsafe procedure for ending a lockdown; and, (2) that

_____

[1] Plaintiff identifies this defendant as "Reardon."

1

1  defendant Rios used excessive force against plaintiff during a riot when he repeatedly shot

2  plaintiff in the head with rubber bullets.

3  **I.   Facts[2]**

4        The events and occurrences giving rise to this action transpired between October 2001

5  and May 2002.  During this time plaintiff was in the custody of the California Department of

6  Rehabilitation and Corrections ("CDCR"), and was confined at Folsom State Prison ("FSP") in

7  Building 1.  Pl.'s Opp'n, Ex. 1, Decl. of Tabarez ("Pl.'s Decl."), at ¶ 1; Defs.' Stmt. of Undisp.

8  Facts ("SUF") 17.  Defendant Butler was the Warden at that prison, SUF 1, and defendant

9  Bunnell was the Associate Warden of Operations.  SUF 2.  Bunnell concentrated primarily on

10 safety and security matters.  SUF 13.  Bunnell reported directly to Butler.  SUF 11.  Defendant

11 Lemon was the Associate Warden for Program Services, and also reported directly to Butler.

12 SUF 11; Butler Decl., at ¶¶ 3-4.  Both Bunnell and Lemon played a major role in the daily

13 running of the prison.  SUF 11.  Acuna was the Facility Captain of Building 1 at FSP and Baber

14 was a Correctional Lieutenant in Building 1.  SUF 4, 5.  Baber reported directly to Acuna.

15 Defs.' May 30, 2007, Mot. for Summ. J., Document styled "Evidence in Support," Ex. 1, Decl.

16 of Acuna ("Acuna Decl."), ¶ 10.  Rendon was the Building 1 Correctional Sergeant, and reported

17 directly to Baber.  SUF 6, 7.  Defendant Rios was a correctional officer.  SUF 8.

18       The defense presented on this motion requires some understanding of the general housing

19 and the layout of the prison.  During the relevant time Northern and Southern Hispanics,

20 generally considered to be rival gangs, were housed at FSP.  SUF 14.  Prison officials classified

21 plaintiff as a Northern Hispanic because he was from Sacramento.  Pl.'s Decl., at ¶ 2; SUF 23.

22 Although the prison had five buildings for housing prisoners, SUF 32, prisoners were not

23 segregated by race or gangs.  Thus, all buildings and all tiers housed Southern Hispanics,

24 Northern Hispanics, whites, blacks and other races and nationalities.  SUF 35.  Building 1 had

25

26       [2] Attached to plaintiff's opposition is his response to defendants' statement of undisputed
     facts.  Unless otherwise noted, all facts contained herein are undisputed by the parties.

five tiers, each of which had four sides, designated A, B, C, and D.  SUF 48.  Each tier housed

about 250 prisoners.  SUF 49.  During the lockdown[3] that ended with the release of prisoners at

issue in this action, Northern Hispanics were released from their cells for meals while all other

prisoners were in their cells.  SUF 58.  The cell doors of the Northern Hispanics remained open

until they returned.  SUF 62.

Riots between Northern and Southern Hispanics resulted in a series of lockdowns from

November 2001 until April 8, 2002.  On October 29, 2001, all Hispanic prisoners at FSP were

placed on lockdown because of a series of fights between Northern Hispanics.  Pl. Depo., at 23.

Plaintiff was not involved in any of these fights, but since he was designated as Northern

Hispanic, he was placed on lockdown.  Defs.' May 30, 2007, Mot. for Summ. J., Document

styled "Evidence in Support," Ex. 9, Deposition of Plaintiff ("Pl.'s Dep."), at 25, 33.  On

October 31, 2001, the lockdown was ended for all Hispanics except those designated Northern

Hispanic.  *Id*., at 31, 33-34.  On November 16, 2001, following an investigation that resulted in

those deemed to have instigated or been involved in the violence being placed in administrative

segregation, prison officials released the general population Northern Hispanics from lockdown.

*Id*., at 38.  On November 29, 2001, there was another fight between Northern Hispanic Prisoners.

*Id*., at 39.  Plaintiff was not involved.  *Id*., at 40.  Prison officials responded by placing Northern

Hispanics on lockdown.  *Id*., at 41.  They were released from lockdown to normal programing on

January 2, 2002.  *Id*., at 42.  However, on January 4, 2002, there was a riot between Northern and

Southern Hispanics, and the entire prison was placed on lockdown.  *Id*., at 43; SUF 15, 16.

Groups of prisoners who were not involved in the riot--whites, African-Americans and

Hispanics not designated as Northerners or Southerners--promptly were released from lockdown

and returned to normal programming.  SUF 19.  During the lockdown, staff in the Investigative

---

[3]  During a lockdown, regular vocational and recreational programs are cancelled, and prisoners are confined to their cells, except for showers, medical emergencies or other controlled activities.  Defs.' May 30, 2007, Mot. for Summ. J., Document styled "Evidence in Support," Ex. 4, Decl. of Butler ("Butler Decl."), at ¶ 10.

1   Services Unit (ISU) interviewed selected prisoners designated as Northern or Southern Hispanic,

2   and other prisoners to determine whether any factions planned future violence or retaliation.

3   SUF 24.  Prison staff also investigated by questioning informants, conducting surveillance of

4   prisoners' phone calls and correspondence to determine the risk of future violence.  SUF 25.  By

5   February of 2002, all Southern Hispanic prisoners were released from lockdown and had normal

6   programming.  SUF 20.  Prison officials kept Northern Hispanics on lockdown because

7   information gathered in the investigation suggested that they had instigated the riot.  SUF 21, 22.

8   In early March of 2002, Northern Hispanics were placed on a modified program that permitted

9   them to exercise in one of the small yards, away from Southern Hispanics and other prisoners in

10   the general population.  SUF 21.  By March and early April, prison officials had no information

11   suggesting that either group of Hispanics planned attacks against the other.  SUF 26.  Thus, in

12   the first week of April 2002, ISU recommended ending the lockdown.  SUF 27.

13          Plaintiff submits evidence that prison staff held weekly meetings to discuss the lockdown

14   and to develop a plan to end it.  Pl.'s Opp'n, Ex. L (ML015), Manuel Memo of July 25, 2002.

15   Defendants Acuna, Baber, Bunnell, Butler, Rios and Rendon submit evidence that supervisory

16   staff discussed the status of Northern Hispanics at their daily operational meetings from January

17   through April 2002.  SUF 28.  Acuna and Baber attended most of the lockdown meetings.  Pl.'s

18   Opp'n, Manuel Memo of July 25, 2002; Pl.'s Opp'n, Ex. L, Lackner Memo of September 16,

19   2002.  All parties agree that at an April 5, 2002, meeting a plan to end the lockdown was

20   discussed.  SUF 29.  At that meeting, Butler decided to end the lockdown for the Northern

21   Hispanics.  *Id.*  Defendants Butler and  Bunnell were present at that meeting.  SUF 30.  Either

22   Acuna or Baber was present.  *Id.*  All agreed that a "controlled unlock" would occur on Monday,

23   April 8, 2002.  SUF 34, 36, 37.  The plan was to release all Northern and Southern Hispanics,

24   except those in administrative segregation, one building at a time and one tier at a time.  SUF 34;

25   Pl.'s Opp'n, Manuel Memo of July 25, 2002.  The purpose of this "controlled" unlock was to

26   permit Northern and Southern Hispanics to  mingle before arriving at the yard.  SUF 36.

Releasing members of both groups simultaneously would allow prison staff closely to monitor the situation and permit prison staff the chance to assess whether it would be safe to continue the release, thereby minimizing the possibility of violence between rival groups. *Id.* Also, this method would make it relatively easy to contain any disturbances. *Id.* There is no evidence that either Acuna or Baber expressed to Butler or Bunnell any objection to the plan once they learned of it. *See*, *generally*, SUF 40, 41.

Defendant Butler had to be away from FSP for two weeks beginning April 8, 2002. SUF 38. There is no evidence of why she had to be away, when the decision to be away was made, or why her absence had to commence April 8. However, she asserts that she did not want to delay implementing the plan. Defs.' Mot. for Summ. J., Ex. 4, Decl. of Butler, ¶ 24. Therefore, she authorized defendant Bunnell to implement the plan while she was gone. *Id.* She also instructed him to reassess the situation on April 8 in order to assure that no new information justified changing the plan. *Id.*

Thus, on April 8, 2002, defendant Bunnell held a meeting with Acuna and other supervisory staff to ensure there was no reason to delay the release, and to explain the plan again and to provide direction for its implementation. SUF 39. Bunnell offered to assign extra staff to Unit I, but Acuna and Baber said that their normal staff was adequate, and declined the offer. Pl.'s Opp'n, Ex. L, Lemon Memo of July 25, 2002. No one voiced any opposition or expressed any reason to delay implementing the plan. SUF 40. All present agreed to implement it that day and to begin with Building 1. *Id.* Bunnell thus reaffirmed the instruction to release *all* prisoners one tier at a time. Pl.'s Opp'n, Manuel Memo of July 25, 2002; SUF 42. There was no discussion of releasing Southerners first and then Northerners, or vice-versa. Pl.'s Opp'n, Ex. L, Lackner Memo of September 16, 2002. Prison officials deployed extra guards on the yard before releasing the prisoners so that any disturbance that might occur could be brought under control quickly. SUF 44. An armed guard, defendant Rios, was posted in a tower and video cameras were set up. SUF 72, 74. In his declaration, defendant Bunnell states that this was done so that

5

1   staff could identify perpetrators of and participants in any violence that might occur.  Bunnell

2   Decl., at ¶ 20.

3          Bunnell ordered Acuna to release the prisoners in Building 1.  SUF 41.  Acuna, in turn,

4   instructed Baber to release the prisoners in Building 1 one tier at a time in a normal manner, as if

5   there were no lockdown. SUF 42.  Baber communicated the order to defendant Rendon.  SUF 45.

6   Although Baber actually knew of the plan to end the lockdown a week before the plan was to be

7   implemented, he did not tell his staff about it.  SUF 43.  Rendon and Baber have submitted

8   evidence that Rendon did not know about the scheduled release until Baber gave the order.  SUF

9   46; Baber Decl., at ¶ 4; Rendon Decl., at ¶ 6.  Rendon expressed to Baber concern for the safety

10  of staff and civilian contract employees.  SUF 47.  Also, about 20 or 25 civilian employees

11  working on a project that was part of a multi-million dollar contract had threatened to leave the

12  prison while the prisoners were released.  *Id*.; Baber Decl., at ¶¶ 11, 12.  Thus, Rendon proposed

13  that prisoners should be released more slowly, one side of a tier at a time.  SUF 50.  Defendant

14  Acuna asserts in his declaration that on his way to Building 1 to begin the release as planned and

15  ordered, he met Baber.  Acuna Decl., at ¶¶ 9, 10.  Rendon, Baber and Acuna assert that before

16  beginning the release, Rendon and Baber discussed Rendon's one-side-of-a-tier suggestion with

17  Acuna, who agreed with it.  Acuna Decl., at ¶¶ 10-14; Baber Decl., at ¶ 11; Rendon Decl., ¶ 8.

18  Baber asserts that he did not understand that the intent of the plan was to permit Northern and

19  Southern Hispanics gradually to mingle as they exited to the yard.  Baber Decl., at ¶ 12.  Acuna

20  asserts that Rendon's plan minimized the potential for conflict between rival Southern and

21  Northern Hispanics.  Acuna Decl., at ¶ 15.  Acuna admits that he knew the result of Rendon's

22  plan would be for more Northern Hispanics than Southern Hispanics being released first.  Acuna

23  Decl., at ¶ 15.  Acuna agreed to Rendon's plan because he did not think that it increased the risk

24  of violence.  *Id*., at ¶ 16.  He also believed that using Bunnell's plan would result in contract

25  employees ceasing work and leaving the prison.  *Id*.  Acuna did not discuss this decision with

26  Bunnell because he did not think it was necessary.  Acuna Decl., at ¶ 17.  He believed that since

he was in charge of Building 1, he had the authority to modify the plan himself. *Id.*

Defendant Lemon disclaims having any part in the decision to release the Northern Hispanics from lockdown on April 8, 2002. Def. Lemon's Mot. for Summ. J., Lemon Decl. in Supp. Thereof, at ¶ 3. He asserts that he did not participate in any meetings where the decision to return to normal programming on April 8, 2002, was made. *Id.*, at ¶ 4. On April 5, 2002, when the decision to implement the unlock on April 8 was made, defendant Lemon was assigned to a different prison. *Id.*, at ¶ 5. When he arrived at FSP for work at around 9:00 a.m. on April 8, 2002, he did not know anything about the plan to release the Northern and Southern Hispanic prisoners to the yard together. *Id.*, at ¶¶ 7, 9. Thus, he did not order the April 8, 2002, unlock. *Id.*, at ¶ 8. Lemon asserts he learned of the plan to release these groups to the yard shortly after he arrived for work, and went to discuss the matter with the captains minutes before the riot began. *Id.*, at ¶ 10.

Plaintiff submits the following evidence about the process of releasing the prisoners to the yard. At first, only Northern Hispanic prisoners were exiting Building 1. Pl.'s Opp'n, Ex. L, Manuel Memo of July 25, 2002. As they entered the yard, the Northern Hispanic prisoners immediately went to an area to the right of the handball court. *Id.* At deposition, plaintiff testified that when he was released from his cell, a guard directed him to the handball court. Pl.'s Dep., Vol. 2, at 101. When plaintiff tried to leave that area before the riot, an officer directed him to stay there. *Id.*, at 135-36. Other Northern Hispanics also were told not to leave that area. *Id.* Plaintiff submits the declaration of fellow prisoner Carlos Leuvano, who also states that correctional staff directed Northern Hispanics to the handball court. Pl.'s Opp'n, Ex. 3, Leuvano Decl., ¶ 7. There they spoke with each other and stood looking in the direction of the gate where they had entered. Pl.'s Opp'n, Ex. L., Manuel Memo of July 25, 2002. Within about 15 to 20 minutes, there were between 30 and 40 Northern Hispanic prisoners in that area near the handball courts. Shortly thereafter, Black, White and Southern Hispanic prisoners began entering the yard. *Id.* Instead of the mixed-race tier by tier release, staff released Northern

7

1    Hispanic prisoners through the front of Building 1, and Southern Hispanics and other races

2    through the back.  Pl.'s Opp'n, Ex. L, Lemon Memo of February 4, 2003.

3            Furthermore, this was done despite "a phone call made at the direction of the Acting

4    Warden Mike Bunnell, via Captain Peiper, directing Lt. Alan Baber . . . to proceed with the

5    unlock protocol as it was initially directed."  *Id.*  Even after this call, more Northern Hispanics

6    exited through the front of the building, while all others exited through the back.  *Id.*  Blacks and

7    Whites went to various areas of the yard.  But the Southern Hispanics gathered in an alley.

8    Manuel Memo of July 25, 2002.  Approximately 8 to 10 minutes later, about 40 to 50 Southern

9    Hispanics walked from the alley along the wall towards the handball court.  Pl.'s Opp'n, Ex. L,

10   Manuel Memo of July 25, 2002, Incident Report of Capt. Peiper; Incident Report of Officer

11   Rios, Incident Report of Sgt. Gonzales.  At deposition, plaintiff testified that after the Northern

12   Hispanics were on the handball court, prison officials watched as over 30 Southern Hispanic

13   prisoners walked all the way across the yard to the handball court where the Northern Hispanics

14   were.  Pl.'s Dep., Vol. 1, at 67; Vol. 2, at 143; Pl.'s Decl., at ¶ 12.  Officer J. Yamamoto

15   observed this movement and heard someone report on the institutional radio, "here they come

16   from the alley."  Pl.'s Opp'n, Ex. E, Suppl. Report of Officer Yamamoto.   Officer T. White

17   notified his supervisor, Sgt. C. Gonzalez about the movement of the Southern Hispanics, but it is

18   not clear whether this is the report Yamamoto heard.  Pl.'s Opp'n, Ex. E, Incident Report of

19   Officer White.  Some moved ahead of the group and appeared to begin playing handball.  Pl.'s

20   Opp'n, Ex. L, Manuel Memo of July 25, 2002.  Apparently at this point, another officer

21   announced over the radio that a large group of Southern Hispanic prisoners was moving towards

22   Officer White's position.  Incident Report of Officer White.  Once the entire group reached the

23   tables near the handball court, Officer White called the yard down, whereupon all the Southern

24   Hispanic prisoners ran towards the Northern Hispanic prisoners and physically attacked them.

25   Manuel Memo of July 25, 2002; Incident Report of Officer White; Pl.'s Opp'n, Ex. E, Incident

26   Report of Facility Captain Payne.   Plaintiff has submitted evidence that upon observing the

1   Southern Hispanics approaching the Northern Hispanics, Captain Peiper asked Bunnell whether

2   to put the yard down, and Bunnell said, "No, not yet."[4]  Pl.'s Opp'n, Ex. L, Cox Memo of Dec. 5,

3   2003.  Plaintiff testified at deposition that in his experience, prison officials delayed longer than

4   usual after the fighting started to intervene and call the yard down.  Pl.'s Dep., at 138.  He also

5   testified that when he heard a guard on the yard radio asking for assistance, the response over the

6   walkie-talkie was for the guard to get out of the way.  Pl.'s Dep., at 139.

7          Defendants Acuna, Baber, Bunnell and Rendon submit the following evidence about the

8   release.  Northerners were released first because their cell doors remained open after returning

9   from breakfast.  SUF 63, 65.  The first Northerners to be released that morning were from side A

10   of tier 1 (tier 1-A).  SUF 64.  Since they were released from their cells first, Northern Hispanics

11   were the first to go to the yard.  SUF 65.  After releasing all of the prisoners from tier 1-A,

12   Rendon and his staff began releasing prisoners from tier 1-B, and continued in order of tiers and

13   sides until all the prisoners in Building 1 who wanted time on the yard had been released.  SUF

14   66.  About 30 minutes after the release began, Bunnell noticed that Northern Hispanics were

15   arriving on the yard in larger numbers than were Southern Hispanics, and wondered whether the

16   process was proceeding as planned.  Bunnell Decl., at ¶ 21.  Bunnell directed Captain Peiper to

17   convey to Baber an order to proceed with the release as planned.  As a large group of Southern

18   Hispanic prisoners was approaching Northern Hispanic prisoners on the handball court, Captain

19   Peiper questioned whether the yard should be put down.  *Id*., at ¶ 22.  In his declaration, Bunnell

20   asserts that he did not at that moment believe that the Southern Hispanics intended to fight.  *Id*.,

21   at ¶ 23.  He asserts that any officer may put the yard down, but no other officers present took that

22   action.  *Id*., at ¶ 24.  Moments later, Southern Hispanics attacked the Northern Hispanics, a riot

23   began and Bunnell ordered the yard down.  *Id*., at ¶ 25.

24   ////

25   

26          [4]  Captain Pieper committed suicide about nine months after the riot.  *See* Pl.'s Opp'n,
     Ex. L.

Acuna asserts that he was inside Building 1 when the riot started.  Acuna Decl., at ¶ 8. Before all the prisoners had been released, he heard someone give the command to get down.  *Id.* He looked outside and saw staff and prisoners running around the yard, and realized that a riot was underway.  *Id.*  Acuna and Baber ran out onto the yard to assist in restoring order.  *Id.*, at ¶ 19.

On the morning of April 8, 2002, defendant Rios was assigned to Tower 22.  Rios Decl., at ¶ 2.  This tower is about 30 or 40 feet from the handball court at the southern corner of the main yard.  *Id.*, at ¶ 3.  He was armed with a weapon called an "Exact Impact Launcher," which fires rubber 40 mm bullets.  *Id.*, at ¶ 4.  According to CDCR policy, a guard should not fire this weapon inside of ten feet of the target.  *Id.*, at ¶ 6.  It should be aimed below the waist of the target and fired only after a prisoner has ignored or disobeyed commands.  *Id.*, at ¶ 5.  From his position in the Tower, he saw about 40 Northern Hispanic prisoners congregate near the handball court and an adjacent table area near the tower.  *Id.*, at ¶ 7.  Plaintiff testified at deposition that he was among the Northern Hispanics mingling in the area of the handball court.  Pl.'s Dep., at 79-80.  At about 10:30 a.m., Rios saw fifty or sixty Southern Hispanic prisoners approach the Northern Hispanic prisoners who were on the handball court and near the table.  Rios Decl., at ¶ 8.  Suddenly, Southern Hispanic prisoners began running towards the Northern Hispanics, and both groups began fighting.  *Id.*, at ¶ 9.

The parties generally agree about the seriousness of the riot.  It lasted 30 to 45 seconds. When prisoners disobeyed orders to get down, guards sprayed them with pepper spray.  Incident Report of Gonzalez; Incident Report of Officer Bales; Suppl. Report of Officer Yamamoto. Prison staff recovered various weapons, including an altered plastic pen about seven inches long, and a 9 ½ inch long metal rod.  Incident Report of Gonzalez; Suppl. Report of Officer Russell. Officers struggled to subdue the rioters.   Prisoners would jump up and continue their attack after having been taken to the ground or having been hit with pepper spray. Incident Report of Officer White; Suppl. Report of Officer Russell.  One officer lost control of his baton, another was hit

with pepper spray and several were injured.  Incident Report of Officer White.

Rios and other officers ordered the prisoners to get down, but the prisoners ignored the command.  Rios Decl., at ¶ 10.  Rios saw more prisoners join in the fighting.  *Id.*  Several Southern Hispanics attacked plaintiff, and Rios saw one slice plaintiff across the arm and cut him below the eye with a knife-like weapon.  *Id.*; Pl.'s Dep., at p. 114-115.  Rios aimed and fired the launcher at the lower extremities of a large concentration of prisoners who were fighting.  Rios Decl., at ¶ 11.  As he fired the first round, a prisoner moved into the line of fire and was hit on the left side of his head.  *Id.*, at ¶ 12.  That prisoner stopped fighting.  Rios continued ordering prisoners to get down, but they continued fighting.  *Id.*, at ¶ 13.  Thus, Rios fired a second round into the same group, aiming at the prisoners' lower extremities.  *Id.*, at ¶ 14.  However, he did not see the impact of this round.  *Id.*  He again ordered the prisoners down, to no avail.  *Id.*, at ¶ 15.  Rios fired a third round, aiming at the legs of the combatants in the same crowd.  *Id.*, at ¶ 16.  This shot missed.  *Id.*  As staff on the yard began to subdue the riot, in part with pepper spray, a group of about six prisoners near the handball court continued fighting.  *Id.*, at ¶ 17.  Rios ordered them down, they ignored the command, and he fired two rounds at their legs.  *Id.*, at ¶ 18.  The prisoners stopped fighting and got down.  *Id.*  After all prisoners on the yard were down, one prisoner got up, ran toward another prisoner who was down, and began beating him about the head.  *Id.*, at ¶ 19.  Rios ordered the attacker to get down, but the prisoner ignored the order.  *Id.*, at ¶ 20.  Rios then fired a round aimed at the legs of the attacker.  *Id.*  The shot missed the prisoner.  *Id.*, at ¶ 21.  Staff on the ground gained control over the attacker by use of physical force.  *Id.*  Plaintiff asserts that he heard Rios boast about having shot a prisoner in the head.  Am. Compl., at 9-10.  Plaintiff claims that he asked why Rios had shot him in the head, and Rios responded that it was an accident.  *Id.*, at 10.  Plaintiff persisted in the conversation, observing that Rios shot three prisoners in the head.  *Id.*  He asserts that Rios admitted as much and found it humorous.  *Id.*

////

1    At about 10:40 a.m., minutes after the riot was brought under control, Tabarez was

2  treated for a 1 1/4 inch laceration on the back of the head and superficial lacerations to his right

3  forearm.  *See* Defs.' Ex. 8.  Tabarez said that he was sitting down and someone jumped on his

4  back.  *Id.*

5    Shortly after the riot, Bunnell confronted Acuna and Baber about not following the plan

6  that had been agreed upon at the April 5 and 8 meetings.  Acuna Decl., ¶ 20; Baber Decl., ¶ 15;

7  Bunnell Decl., ¶ 31.  Acuna admitted that he had approved the plan that Rios had suggested to

8  Baber.  Bunnell Decl., at ¶ 32.  Butler learned that Acuna, Rios and Baber had not followed her

9  plan.  Acuna Decl., at ¶ 21; Bunnell Decl., at 33; Butler Decl., at ¶¶ 25-26.  Thus, Butler and

10  Bunnell reprimanded Acuna and Baber for failing to follow the plan as agreed.  Acuna Decl., at

11  ¶ 21; Bunnell Decl., at 33; Butler Decl., at ¶¶ 25-26.

12  **II.    Evidentiary Objections**

13    Defendants Acuna, Baber, Bunnell, Butler, Rios and Rendon object to documentary

14  evidence plaintiff submitted with his opposition.  Defendants object to various assertions made

15  in plaintiff's declaration and in the declaration of Ruiz on the grounds that they are hearsay, lack

16  foundation, state opinions, and are not based on personal knowledge.  Defendants object to

17  medical records, incident reports by prison guards made at or around the time of the riot, a

18  CDCR program status report, portions of the verified amended complaint, and the Inspector

19  General's Report on the riot of April 8, 2002, on the ground that they contain inadmissible

20  hearsay, are not authenticated, they lack foundation, express opinions.  For the reasons

21  explained, the objections are overruled.

22    Plaintiff's evidence and defendants' objections cannot be divorced from the nature of this

23  proceeding, i.e., summary judgment, in which defendants are the moving parties.  *See Burch v.*

24  *Regents of the University of California*, 433 F.Supp.2d 1110, 1118-24  (E. D. Cal. 2006).  The

25  portion of the rule governing such a motion supported by affidavits and records provides that the

26  affidavits "shall set forth such facts as would be admissible in evidence . . . ."  Fed. R. Civ. P.

56(e).  On summary judgment, the non-moving party's evidence need not be in a form that is admissible at trial.  *See Burch*, 433 F.Supp.2d at 1119 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Instead, a court is concerned with the admissibility of the contents of the evidence.  *Id.*  Thus, on summary judgment, "objections to the *form* in which the evidence is presented are particularly misguided where, as here, they target the non-moving party's evidence."  *Burch*, 433 F.Supp.2d at 1119.  Accordingly, as long as a party submits evidence which, regardless of its form, may be admissible at trial, it may be considered on summary judgment.  *Id.* at 1120 (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir.2003)).

As this court has previously had occasion to observe, this growing trend of objecting to every stitch of paper submitted in opposition to a summary judgment motion appears to becoming all the rage and the practice is simply not helpful.[5]  Absent a specific and legitimate showing that a particular item of evidence is not admissible and that it relates to a factual dispute that actually makes a difference, these scatter shot objections detract from, rather than support one's confidence in the reliability of the representations made in support of the motion.  "Summary judgment is not a game of 'Gotcha!' in which missteps by the non-movant's counsel, rather the merits of the case, can dictate the outcome."  *Burch*, 433 F. Supp. 2d at 1120.

The objection that plaintiff's evidence lacks a proper foundation or authentication is not well-taken.  As discussed below, defendants do not seriously dispute the authenticity of the copies plaintiff submitted.  Obviously, even on summary judgment, the party relying on affidavits and records must lay a proper foundation.  *Beyne v. Coleman Sec. Servs., Inc.*, 854

---

[5]  Regrettably, far too often "attorneys routinely raise every objection imaginable without regard to whether the objections are necessary, or even useful, given the nature of summary judgment motions in general, and the facts of their cases in particular. For example, objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself; yet attorneys insist on using evidentiary objections as a vehicle for raising this point. A court can award summary judgment only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant."  *Burch*, 433 F.Supp.2d at 1119.

F.2d 1179, 1182 (9th Cir. 1988).  "[W]hether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed is, however, questionable."  *Burch*, 433 F.Supp.2d at 1120.  Attorneys, as officers of the court, have an obligation to narrow issues and facilitate the process, not hinder and belabor it with poorly founded or unnecessary objections.  "The court cannot stress enough that it does not behoove anyone to make objections simply for the sake of making objections."  *Id.* at 1121, n.10.  The expectation in that regard is even higher when the attorney represents government officers and agencies.

Here, in spite of the *pro forma* objections, defendants do not actually explain how and why they contest the authenticity of the documents plaintiff has submitted.  Their general objection is particularly suspect because all of the documents plaintiff submits would find their source in the prison system, either in plaintiff's files or in the prison bureaucracy.  Thus, if there were a valid basis for contesting the authenticity of the copies of these records, defendants could unearth and present it.  But they have not.  "[W]here the objecting party does not contest the authenticity of the evidence submitted, but nevertheless makes an evidentiary objection based on purely procedural grounds," then the court should consider the evidence.  *Id.*  In such a situation, it would appear equally probable that the documents are what they purport to be as it is that they are not.  *See Id.*  For these reasons, all of defendants' objections for lack of proper foundation and lack of authentication are overruled.

Defendants also object on hearsay grounds.  This objection is overruled for two reasons.  First is the form of the objection; second is the nature of the non-moving party's burden on summary judgment.  Some of the objections are *pro forma* in that defendants object to entire documents, not particular statements.  Others object to particular statements without reference to the purpose or purposes for which they might be offered.  Relevance cannot possibly be determined without meaningful context.  An objection based on hearsay inherently is bound to the context in which the allegedly objectionable evidence is offered and how the offered evidence does or does not tend to prove or disprove a material factual dispute.  *See Burch*, 433

F.Supp.2d at 1122 ("even seemingly appropriate objections based on hearsay and failures to authenticate/lay a foundation are difficult to address away from the dynamics of trial.")  Insofar as a letter or record may on its face constitute hearsay, the particular statements upon which plaintiff relies may very well either be admissible nonetheless or may not be hearsay, depending on the purpose for which plaintiff offers the statement.  "The court is not inclined to comb through these documents, identify potential hearsay, and determine if an exception applies - all without guidance from the parties." *Id.* at 1124.  Thus, to prevail on a hearsay objection, defendants must object to particular statements and explain the objection.  Defendants' failure to do so is sufficient basis for overruling the objection.

With respect to the nature of this proceeding, the court "treat[s] the opposing party's papers more indulgently than the moving party's papers." *Id.* (citing *Lew v. Kona Hosp.,* 754 F.2d 1420, 1423 (9th Cir. 1985)).  While a court need not ignore the evidentiary ramifications of a declaration based nearly entirely on hearsay, *see Burch*, 433 F.Supp.2d at 1121 (noting that the Ninth Circuit does not uniformly apply the principle of indulgence), it is noteworthy here that plaintiff proceeds without counsel.  Furthermore, he does not rely on evidence which on its face presents evidentiary obstacles which would prove insurmountable at trial.  *See Id.* at 1122 (noting that at trial, "when a party raises valid evidentiary objections, the opposing party will have an opportunity to present the evidence in an alternative and admissible form.").  Insofar as there may be valid hearsay objections, they are better left for trial, if there is to be one.

For these reasons, the defendants' objections to the plaintiff's evidence submitted in opposition to this motion are overruled.

**III.    Standards on Summary Judgment**

Summary judgment pursuant to Fed. R. Civ. P. 56(a) avoids unnecessary trials in cases with no disputed material facts.  *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

1 party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

2 (1986).

3       Rule 56 serves to screen the latter cases from those which actually require resolution of

4 genuine disputes over facts material to the outcome of the case; e.g., issues that can only be

5 determined through presentation of testimony and evidence at trial such as credibility

6 determinations of conflicting testimony over dispositive facts.

> 7     In three recent cases, the Supreme Court, by clarifying what the
> non-moving party must do to withstand a motion for summary
> 8 judgment, has increased the utility of summary judgment. First, the
> Court has made clear that if the non-moving party will bear the
> 9 burden of proof at trial as to an element essential to its case, and
> that party fails to make a showing sufficient to establish a genuine
> 10 dispute of fact with respect to the existence of that element, then
> summary judgment is appropriate. *See Celotex Corp. v. Catrett*,
> 11 477 U.S. 317 (1986). Second, to withstand a motion for summary
> judgment, the non-moving party must show that there are "genuine
> 12 factual issues that properly can be resolved only by a finder of fact
> because they may reasonably be resolved in favor of either party."
> 13 *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis
> added). Finally, if the factual context makes the non-moving
> 14 party's claim implausible, that party must come forward with more
> persuasive evidence than would otherwise be necessary to show
> 15 that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp.*, 475 U.S. 574 (1986). No longer can it be
> 16 argued that *any disagreement* about a material issue of fact
> precludes the use of summary judgment.

17

18 *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert.*

19 *denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added). In short, there is no

20 "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to

21 establish the existence of an element essential to that party's case, and on which that party will

22 bear the burden of proof at trial." *Grimes v. City and Country of San Francisco*, 951 F.2d 236,

23 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).

24 ////

25 ////

26 ////

1     Thus, to overcome summary judgment an opposing party must show a dispute that is both

2     genuine, and involving a fact that makes a difference in the outcome.[6]  Two steps are necessary.

3     First, according to the substantive law, the court must determine what facts are material.

4     Second, in light of the appropriate standard of proof, the court must determine whether material

5     factual disputes require resolution at trial.  *Id.,* at 248.

6     When the opposing party has the burden of proof on a dispositive issue at trial, the

7     moving party need not produce evidence which negates the opponent's claim.  *See e.g., Lujan v.*

8     *National Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  The moving party need only point to matters

9     which demonstrate the absence of a genuine material factual issue.  *See Celotex v. Cattret*, 477

10    U.S. 317, 323-24 (1986).

11    If the moving party meets its burden, the burden shifts to the opposing party to establish

12    genuine material factual issues.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586.[7]  The

13    opposing party must demonstrate that the disputed facts are material, i.e., facts that might affect

14    the outcome of the suit under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec.*

15    *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that

16    disputes are genuine, i.e., the parties' differing versions of the truth require resolution at trial, *see*

17    *T.W. Elec.*, 809 F.2d at 631.  There can be no genuine issue as to any material fact where there is

18    a complete failure of proof as to an essential element of the nonmoving party's case because all

19    other facts are thereby rendered immaterial.  *Celotex*, 477 U.S. at 323.  The opposing party may

20    not rest upon the pleadings' mere allegations or denials, but must present evidence of specific

21

22    ⁶ On August 20, 2004, the court informed plaintiff of the requirements for opposing a
      motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154

23    F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.
      Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

24    ⁷ The nonmoving party with the burden of proof  "must establish each element of his
      claim with significant probative evidence tending to support the complaint."  *Barnett v. Centoni*,

25    31 F.3d 813, 815 (9th Cir. 1994) (internal quotations omitted).  A complete failure of proof on an
      essential element of the nonmoving party's case renders all other facts immaterial, and entitles

26    the moving party to summary judgment.  *Celotex*, 477 U.S. at 322.

disputed facts.  *See Anderson*, 477 U.S. at 248.[8]  Conclusory statements cannot defeat a properly supported summary judgment motion.  *See Scott v. Rosenberg*, 702 F.2d 1263, 1271-72 (9th Cir. 1983).

The court does not determine witness credibility.  It believes the opposing party's evidence, and draws inferences most favorably for the opposing party.  *See Anderson*, 477 U.S. at 249, 255.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences.  *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322).

If reasonable minds could differ on material facts at issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other hand,"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant summary judgment.

With these standards in mind, it is important to note that plaintiff bears the burden of proof at trial over the issue raised on this motion, i.e., whether the defendants acted with deliberate indifference to the plaintiff's safety.  Equally critical is that "deliberate indifference" and "excessive force" are essential elements of plaintiff's claims.  Therefore, to withstand defendant's motion, plaintiff may not rest on the mere allegations or denials of his pleadings.  He must demonstrate a genuine issue for trial, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989), and he  must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

---

[8]  A verified complaint may be used as an affidavit in opposition to the motion.  *Schroeder v McDonald*, 55 F. 3d 454, 460 (9th Cir. 1995); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam).

1    **IV.    Analysis**

2          "As to materiality, the substantive law will identify which facts are material.  Only

3    disputes over facts that might affect the outcome of the suit under the governing law will

4    properly preclude the entry of summary judgment."  *Id.* at 248.  Here, plaintiff's action arises

5    under 42 U.S.C. Section 1983 and the Eighth Amendment.  To prevail at trial, he must prove that

6    the defendants deprived him of his Eighth Amendment rights while acting under color of state

7    law.  To prove his claims against Acuna, Baber, Bunnell, Butler and Lemon, plaintiff must show

8    by a preponderance of competent evidence that the defendants knew plaintiff faced a risk of

9    harm that "is not one that today's society chooses to tolerate," and that the defendants were

10   "deliberately indifferent" to that risk.  *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).  With

11   respect to his claim against defendant Rios, plaintiff must prove by a preponderance of the

12   evidence that Rios used force maliciously and sadistically solely for the purpose of causing

13   plaintiff physical harm.  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).   As discussed below,

14   plaintiff has established a genuine dispute for trial on some claims against some defendants, but

15   not against others.

16         The Eighth Amendment prohibits deliberate indifference to conditions of confinement

17   that violate contemporary standards of decency, i.e, those which deny "the minimal civilized

18   measure of life's necessities," or which pose a risk of a harm "that is not one today's society

19   chooses to tolerate." *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Helling v. McKinney*, 509 U.S.

20   25, 36 (1993); *Farmer*, 511 U.S. at 837.  The Eighth Amendment requires that the conditions of

21   a prisoner's confinement, even if harsh, have some legitimate penological purpose.  *See Hudson

22   v. Palmer*, 468 U.S. 517, 584 (1984); *Rhodes*, 452 U.S. at 347.  Conditions of confinement

23   violate the Eighth Amendment if they cause unnecessary and wanton infliction of pain, i.e., a

24   condition completely devoid of penological justification. *Rhodes v. Chapman*, 452 U.S. 337,

25   346-47 (1981); *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  These principles take account of

26   the important consideration that confinement "strips [prisoners] of virtually every means of self-

1    protection." *Farmer*, 511 U.S. at 833.

2    **A. Defendant Rendon**

3    Plaintiff claims that defendant Rendon was deliberately indifferent to his safety by

4    releasing prisoners from Building 1 in a manner Rendon knew was likely to cause a riot.  It is

5    beyond dispute that all defendants knew that there was a serious safety risk that had to be

6    addressed and controlled in the release of the inmates from lockdown.  It is also clear that the

7    defendants knew that without careful planning and control over the manner of release, the

8    probability of acts of violence would be even greater.  That was the very point of the many

9    meetings in which the original plan was developed.  In particular, it was well known that

10   releasing to the yard inmates that were members of the rival gangs necessarily entailed some

11   probability of violence between them and plaintiff had been identified by staff as a member of

12   one of the two gangs.

13   Defendant Rendon contends on this motion that there is no genuine factual issue about

14   whether he was indifferent to plaintiff's safety, asserting that he was very much concerned for

15   the safety and that he believed that his plan was safer than Butler's.  The question, then, is

16   whether there is adequate evidence upon which a jury could reasonably rely to render a verdict

17   that Rendon, in changing the plan, was deliberately indifferent to inmate safety.

18   Prison officials violate the Eighth Amendment's prohibition on cruel and unusual

19   punishment if they are deliberately indifferent to a risk of harm at the hands of other prisoners.

20   *Farmer*, 511 U.S. at 837.   To be deliberately indifferent, a prison official must know of, or infer

21   from the circumstances, a risk of harm or injury from others that "is not one that today's society

22   chooses to tolerate," yet fail to take reasonable actions to mitigate or eliminate that risk.  *Farmer*,

23   511 U.S. at 837.

24   Turning to the facts of this case, there is a genuine dispute for trial.  It is undisputed that

25   Northern and Southern Hispanics at FSP had an ongoing violent rivalry.  They had been

26   involved in a riot on January 4, 2002, resulting in a lockdown of the entire prison and a nearly

1   three-month investigation.  Gradually, prisoners were returned to normal programming, and by

2   February of 2002, all prisoners but Northern Hispanics had been returned to normal

3   programming.  By the end of March, the investigation was complete and investigators

4   recommended that prison officials attempt to reintegrate Northern Hispanics into the general

5   population.  Thus, on April 5, 2002, Warden Butler decided that Northern Hispanics would be

6   released to the yard with the general population on April 8, 2002, as long as no new information

7   suggested that the release would be unsafe.  Rendon, a sergeant assigned to Building 1, has

8   submitted evidence that he did not know of Warden Butler's orders until the morning of April 8.

9   Rendon asserts in his declaration that when he learned of the plan, he was of the opinion that it

10  was not "prudent" because he had "concerns for the safety of staff and civilian contract

11  employees working on a retrofit project in Building 1."  Rendon Decl., at ¶ 6.  He asserts that

12  about 20 or 25 civilian contract employees working on a multi-million dollar seismic retrofit

13  project in Building 1were in such fear for their safety that they threatened to leave the work site.

14  Rendon therefore proposed releasing the prisoners by one side of one tier at a time instead of one

15  tier at a time.  In an *ad hoc* fashion, he discussed this major revision to the plan with Lieutenant

16  Baber and Captain Acuna, and Acuna adopted it.

17          Rendon's argument as to the possible walk out of the contract workers is of no assistance

18  in his endeavor to avoid trial.  His assertions, if taken literally, suggests that the civilian workers

19  communicated an intent to leave the work site not if the lockdown was ended, but *only* if the

20  lockdown was ended *as planned*, and he thus devised a new plan to satisfy their concerns and

21  convince them not to leave the work site.  Such an explanation would hardly entitle him to

22  judgment as a mater of law.  To the contrary, budgetary concerns are, as a matter of law, not a

23  basis for denying a prisoner the basic necessities of life.  *See Jones v. Johnson*, 781 F.2d 769,

24  771-72 (9th Cir. 1986) (pretrial detainee stated a claim for deliberate indifference where record

25  showed no explanation other than budget concerns for denying medical treatment).  Concern

26  about civilian workers leaving the job site does not help him.  Moreover, to the extent that he

1    hinges this motion on his motives, "[q]uestions involving a person's state of mind . . . are

2    generally factual issues inappropriate for resolution by summary judgment." *Braxton-Secret v.*

3    *A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985).

4           More compelling is the concern for safety of all persons involved, including staff,

5    inmates and the civilian workers.  But this concern, too, is problematic on summary judgment.

6    Here, Rendon knew of the violent rivalry between Northern and Southern Hispanics.  Indeed, the

7    concern was so heightened that prison staff at the highest levels invested many hours and

8    resources evaluating options and studying the question of how to end the lockup in a manner that

9    posed the least risk of more violence.  Many meetings were devoted to that end.  A final plan

10   was adopted.  An entire team of staff who would implement the plan were instructed on it and

11   told how they were to proceed.  Notwithstanding that planning, and the knowledge that others

12   would be acting in accordance with the adopted plan, Rendon concluded that he had a better idea

13   which would provide a greater measure of safety.  A jury might well agree with him, or at least

14   conclude that he acted on short notice (Lieutenant Baber did not tell his staff, including Rendon,

15   about the plan until the time of the order to release the inmates) and under the circumstances

16   with due regard for inmate and staff safety.  But it cannot be said on this record that a reasonable

17   jury could not conclude that the sudden change in the release procedures just as the order was

18   given to put the plan into action was deliberately indifferent.

19          There can be little dispute that Rendon knew there was substantial risk in any, last

20   second, unplanned change in the procedures.  Although he was, inexplicably, not informed of the

21   plan until the last minute, he was informed of the Warden's order to proceed with a previously

22   conceived procedure.  A jury could find that he was aware from this that the other staff members

23   were proceeding under the procedures previously adopted.  A reasonable jury could also

24   conclude that Rendon knew that changing the timing and order by which inmates were released

25   would increase the chances of losing control over the inmates.  There obviously was no time to

26   vet the new plan.  Thus, Rendon's concern may argue in favor of pressing for a delay in release

of the inmates.  But proceeding with a last minute change left no time to consult with other staff, or to ensure that all staff who would have to control the inmates being released from their cells were instructed on the changes, understood those changes and their safety implications, and understood how to implement them.  In assessing whether a deliberate choice  to take that risk is, in fact, indifference to the safety of the inmate who were left out numbered by a rival gang, a jury could reasonably take into account whether Rendon knew his plan would result in more Northerners arriving on the yard than Southerners.

Rendon also suggests that it was simply more convenient to release Northern Hispanics first because their cells already were unlocked.  While he denies knowledge of the articulated reasons for it, he knew that Butler made a decision about how to end the lockdown, and he cannot deny inferring that this represented a considered decision about prison security, including the safety of the prisoners involved.  There is no evidence that Rendon had any knowledge or experience that made him uniquely qualified to substitute his judgment for that of Butler.  Furthermore, while it is undisputed that Rendon did not directly report to Bunnell, there is no evidence that Rendon suggested notifying Bunnell that the plan had been changed.  Plaintiff's evidence shows that when they saw how the release was progressing, guards and officers alike became concerned that there was a security breach, and Bunnell ordered Baber to proceed as originally planned.  Rendon's assertion that he believed his plan was safer must be weighed against these facts.  The court finds that the record as it stands requires the finder of fact to make credibility findings that are not appropriately made on summary judgment.  A reasonable jury could find in plaintiff's favor.  Accordingly, defendant Rendon is not entitled to judgment as a matter of law.

**B. Defendant Baber**

Plaintiff alleges Lieutenant Baber was deliberately indifferent to his safety by agreeing to Rendon's alternative plan for ending the lockdown.  Like Rendon, Baber asserts that he believed the alternative plan was better because the release of prisoners to the yard was more gradual, and

it was more likely to ensure that miscellaneous staff felt safer and that the 20 or 25 civilian contract workers would not leave the site of a multi-million dollar construction project.  And like Rendon, Baber agreed to a major change in the procedures without adequate time to inform others involved and to ensure that the change did not make the threat of violence more probable. The risk of gang violence during the release was known.  Taking the chance on a last minute deviation from the approved plan may well be viewed by the jury as wreckless, and even deliberately indifferent.

It is not clear from the record whether Baber was at the April 5, 2002, meeting.  Baber does not specify whether he was there, and Bunnell states in his declaration that either Baber or Acuna was present.  Baber asserts he did not know the reasons for Butler's plan.  It is undisputed, however, that Baber was present at the meeting early on April 8.  He therefore had direct orders about how the unlock would proceed and knew that the plan required Northern and Southern Hispanics to mingle before arriving on the yard.  *See* Pl.'s Opp'n, Ex. L, Lackner Memo of September 16, 2002.  It is reasonable to infer that he therefore knew this method was deemed safer than allowing Northerners and Southerners to congregate on the yard in large groups with unbalanced numbers before encountering each other.  Furthermore, he did not then voice any objections to the plan, permitting the inference that he agreed this was the safest plan.

Baber admits that he knew Rendon's plan would result in, at the very least, the initial release to the yard of more Northern Hispanics than Southern Hispanics.  Plaintiff's evidence demonstrates that other guards and officers immediately became aware of the security problem when they saw how the process of ending the lockdown was proceeding.  Furthermore, Bunnell ordered Baber to alter the process and proceed as originally planned.  Given that Bunnell's evidence shows that the order was given, and Baber does not deny receiving the order, the court infers that he did in fact receive it.  It cannot plausibly be argued in the face of such an order that Bunnell was unaware that prison security was at risk.

////

1    It is for a jury to decide whether Baber was deliberately indifferent in supporting the last

2    minute change in the release procedure.  Also, as with defendant Rendon, it is for a jury to

3    decide whether defendant Baber changed his mind about the plan in order to ensure greater

4    safety to miscellaneous staff and civilian workers over the safety of the prisoners, and whether

5    his interest was in preserving the schedule of a multi-million dollar contract.  A reasonable jury

6    could disbelieve Baber and find in favor of plaintiff.  The jury could also conclude that Baber

7    acted with due regard for inmate safety.  Thus, Baber is not entitled to judgment as a matter of

8    law.

9    **C.  Defendant Acuna**

10    Plaintiff alleges that Captain Acuna knew that changing the unlock plan posed an

11    unacceptable risk of serious harm, but changed it anyway.  Acuna contends that there is no

12    genuine issue about whether he was deliberately indifferent.  Acuna also argues that he was

13    concerned that the civilian employees might leave the prison during the lockdown and he

14    thought that Rendon's plan was better.  He states that it minimized the potential for conflict

15    because Northerners and Southerners on the same tier would be released more slowly than under

16    Butler's plan.  He concedes, however, that Northerners would arrive on the yard in a greater

17    number sooner than Southerners.  His declaration states that he did not understand that the

18    original plan was designed to permit Northern and Southern Hispanics to mix with each other as

19    they left the building so that staff could observe them together before they arrived at the yard.

20    As with Baber, it is not clear whether he was at the April 5 meeting.  It is, however, undisputed

21    that Acuna voiced no concerns or objections at the April 8 meeting.  Thus, the evidence shows

22    that like Baber, defendant Acuna agreed to Butler's plan without reservation until Rendon voiced

23    concern about the safety of miscellaneous staff and of civilian workers, who somehow learned of

24    the plan and threatened to leave the work site at a financial cost to the CDCR.  Then Acuna

25    decided that Rendon's plan was better than Warden Butler's, and approved it without consulting

26    his superior officer, Bunnell. As with defendants Baber and Rendon, there is no evidence that

1    defendant Acuna was uniquely qualified to substitute his opinion for that of the Warden.  And

2    again, the decision to not communicate this change to Bunnell is troubling in light of other staff

3    having been ordered to proceed under the Warden's plan.  This, in and of itself is a security

4    breach that a jury could reasonably rely upon to find a wrecklessness that amounts to deliberate

5    indifference.  The evidence at this stage is insufficient for the court to find that there is no

6    genuine dispute about Acuna's decision and intent in changing the unlock plan.  Accordingly,

7    Acuna's motion must be denied with respect to this claim.

8         Plaintiff also claims that defendant Acuna was deliberately indifferent for failing to call

9    the yard down sooner.  Acuna again contends that plaintiff cannot present sufficient evidence to

10   meet his burden of proof to show Acuna was deliberately indifferent.  In addition to the evidence

11   and circumstances discussed above, plaintiff has submitted evidence that Northern Hispanics

12   were released to the yard and directed to a handball court, and that thereafter Southern Hispanics

13   arrived and gathered in an alley area.  Plaintiff's evidence also shows that a group of at least 20

14   Southern Hispanics began walking across the yard towards the Northern Hispanics, and that this

15   was unusual because ordinarily guards would prevent groups of even three prisoners of the same

16   race from moving together about the yard.  Defendants' evidence shows that any officer had the

17   authority to put the yard down.  It is undisputed that despite communications amongst guards

18   about this unusual movement, the anticipation of gang violence and an inquiry by one captain

19   about whether to take the yard down, Acuna did not do so.  Plaintiff alleges in the verified

20   amended complaint that defendant Acuna watched the situation progress and failed to act until it

21   was too late.

22        In his declaration, Acuna asserts that he was in Building 1 when the riot started,

23   suggesting that he was not on the yard observing the scene while drinking coffee, as plaintiff

24   alleges.  Thus, there is a dispute about whether Acuna knew of the potential for danger.  Quite

25   sensibly, he does not dispute that a group of at least 20 Southern Hispanics walking across the

26   yard towards the Northern Hispanics is a fact from which a guard would infer that there was an

1  unacceptable risk of an attack.  On this evidence, a reasonable jury could find in plaintiff's favor.

2  Thus, defendant Acuna's motion must be denied.

3  **D.  Defendant Bunnell**

4  Plaintiff alleges that Associate Warden Bunnell was deliberately indifferent to his safety

5  by altering the unlock plan and by not preventing the riot.  The court addresses each claim in

6  turn.

7  With respect to altering the unlock plan, Bunnell asserts that plaintiff presents no

8  evidence that he was deliberately indifferent.  It is undisputed that Bunnell held a meeting on

9  April 8 at which he reviewed the unlock plan, determined it should be implemented and ordered

10  Acuna to implement it.  There is no evidence that Bunnell knew of Rendon's plan before Acuna

11  approved it.  In fact, Acuna asserts that he did not consult Bunnell about it.  Rather, the evidence

12  is that Bunnell did not know about it until he became suspicious while watching prisoners arrive

13  on the yard.  On this evidence, no reasonable jury could find that Bunnell knew that the plan had

14  been changed until after the prisoners had been released.  Thus, Bunnell is entitled to judgment

15  as a matter of law on this claim.

16  The evidence is not so clear with respect to whether he was deliberately indifferent by

17  failing to call the yard down.  Bunnell argues that plaintiff cannot demonstrate a genuine issue

18  about whether he was deliberately indifferent.  As discussed above, a prison official observed

19  that Northerners exited Building 1 through the front and Southerners exited through the back.

20  Northerners arrived on the yard first, and immediately went to the handball court.  Plaintiff's

21  evidence shows that once the Northerners finally were gathered on the handball court, Southern

22  Hispanics were amassed in an area known as the "alley," across the yard from the handball court.

23  This group of anywhere from 20 to 50 Southerners were then permitted to traverse the yard in

24  plain view of prison officials, including Bunnell.  Plaintiff's evidence shows that ordinarily,

25  guards intervene when three or more prisoners of the same race move together about the yard.

26  Bunnell does not contest any of these facts.

1    The evidence shows that at some point Bunnell ordered a guard to direct Baber to

2    proceed with the original plan for releasing the prisoners.  This suggests that he knew that the

3    plan for releasing the prisoners had been changed.  However, there is no direct evidence that

4    anyone had informed Bunnell of the change or that he knew before the release began that Acuna,

5    Baber and Rios had decided not to follow Butler's orders.  However, the continued flow of

6    prisoners from Building 1 onto the yard made it clear that Baber disobeyed this order.  It was

7    reasonable for Bunnell to assume, as he apparently did, that his subordinate would follow orders.

8    However, once it was apparent that his order was disobeyed, it was not reasonable to delay

9    taking decisive action to gain control of the yard given the known risk inherent with the unlock

10   process even under the approved plan.  A jury, in deciding whether this constitutes indifference,

11   will be entitled to consider that groups of three normally result in guard intervention and that

12   Bunnell watched as a gang of between 20 and 50 advanced, across the yard, on a rival gang.  The

13   jury will also be entitled to consider evidence that one guard broadcast over a hand-held radio

14   the fact of the Southerners' movement across the yard and that at least one guard questioned over

15   the radio whether the yard should be called down.  While defendant asserts that officers were not

16   issued walkie-talkies or hand-held radios, plaintiff's evidence shows that Bunnell responded to

17   this latter broadcast with, "No, not yet."[9]  This suggests that he did have access to some sort of

18   radio or walkie-talkie.  Moreover, if the evidence is believed, the response "not yet" implies that

19   he believed that the yard should be put down some time.  A jury could conclude that at that

20   moment, he knew not only that there was a risk of violence, but that violence was imminent but

21   he chose to take no action.  A jury might find at trial some justification for the choice to wait.

22   ////

23

---

24       [9] Plaintiff has submitted evidence that this statement was captured on the video cassettes
     that prison authorities placed on the yard that day.  Pl.'s Opp'n, Ex. L at 7 (May 7, 2002,
25   Memorandum from Sgt. S. Cox to M. Bunnell).  Plaintiff's evidence further suggests that Baber
     noted that this statement did not reflect favorably on the prison, and instructed a subordinate to
26   alter the audio portion of the tape.  *Id.*

1    On the other hand, on this evidence, a reasonable jury could find in plaintiff's favor.  Therefore,

2    defendant Bunnell is not entitled to judgment as a matter of law on this claim.

3        **E.  Defendant Butler**

4        Plaintiff alleges that Warden Butler was deliberately indifferent because she was

5    involved in orchestrating the riot.  There is no evidence to support that claim.[10]  It is undisputed

6    that following extensive investigation, members of the ISU recommended that Northern

7    Hispanics be returned to normal programming.  Thus, on April 5, 2002, Butler met with Bunnell

8    and Acuna, who played a major role in the daily running of the prison, and together they decided

9    on a plan to release Northern Hispanics from lockdown.  However, the fact that they met in no

10   way establishes indifference by the Warden.  Plaintiff offers no evidence that these defendants

11   discussed ending the lockdown even though they believed it was not safe to do so.  Nor does he

12   offer any evidence that these defendants at that time intended a change in the unlock plan on

13   April 8 that would jeopardize prison security and result in a riot.  It is undisputed that Butler was

14   not at the prison on April 8.  She has submitted evidence that her schedule required her to be out

15   of town that day.  Whether the Warden's absence on the day that the unlock plan was

16   implemented was problematic in a management context, her absence itself does not constitute

17   deliberate indifference under the Eighth Amendment.  To suggest that her absence from the

18   prison made it more likely that Acuna would disobey an order is mere speculation.  Moreover, it

19   fails to rise to a level of neglect that establishes deliberate indifference.  Plaintiff produces no

20   evidence upon which a jury could reasonably find for plaintiff on his claim against Warden

21   Butler and her motion must be granted.

22       **F.  Defendant Lemon**

23       Plaintiff claims that Associate Warden Lemon was deliberately indifferent to his safety

24   by not calling down the yard before Bunnell did.  Lemon asserts that there is no genuine issue

25

26       [10]  To the contrary.  If she is to be criticized over this event, it would be for her lack of
     involvement on the day in question.

about whether he was deliberately indifferent.  It is undisputed that he was not involved in the decision to end the lockdown, in developing the plan, or in changing the plan.  Rather, he learned of the plan when he arrived for work the morning of April 8, 2002, in a discussion with the captains.  Plaintiff asserts that as prisoners arrived on the yard and in the time preceding the riot, Lemon was standing near the canteen area at "5 count gate" drinking coffee and facing the handball court area.  Am. Compl., at 7.  Lemon does not deny that he was observing the yard while prisoners were exiting Building 1 and filing onto the yard.  In fact, Lemon drafted a memorandum dated February 4, 2003, showing that he believed that the release was not going as planned.  The problem Lemon encountered on this motion is that he and other officers knew that even after a call ordering Baber to proceed as originally planned, Northerners and Southerners continued to exit the building separately and congregate in discrete areas of the yard.  It bears repeating that any officer could call down the yard.   Lemon did not do so.  In light of the undisputed recent history of violence between Northerners and Southerners, a reasonable jury could find that Lemon knew violence would erupt yet failed to take reasonable measures to prevent it.  Thus, Lemon's motion must be denied.

## F. Defendant Rios

Plaintiff alleges that defendant Rios used excessive force against him while attempting to quell the riot.  In particular, he asserts that Rios purposely aimed his launcher at prisoners' heads, causing injury to plaintiff.  Rios asserts that plaintiff cannot demonstrate a genuine issue about whether he acted solely to cause harm.  To survive Rios's motion, plaintiff must submit evidence Rios engaged in wrongdoing that is objectively serious enough to violate the Eighth Amendment, and that he acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 7-9 (1992).  Thus, plaintiff's evidence must show that under the circumstances the force used was not justified, and it was not applied "in a good faith effort to maintain or restore discipline," but instead "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  When determining whether the force used was

1   excessive, the court considers (1) the need to use force, (2) the relationship between that need

2   and the amount of force used, (3) the threat reasonably perceived by prison officials, (4) any

3   effort made to temper the forceful response, and (5) the extent of the injury suffered by the

4   inmate. *Hudson*, 503 U.S. at 7.  In general, "[p]rison administrators ... should be accorded wide-

5   ranging deference in the adoption and execution of policies and practices that in their judgment

6   are needed to preserve internal order and discipline and to maintain institutional security."

7   *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).

8         The seriousness of the riot was grave.  A violent attack by a large number of one gang

9   upon rival members of another was under way.  Some inmates were armed with stabbing

10  weapons.  The parties agree that repeated commands for the prisoners to get down went mostly

11  unheeded, and that guards then used pepper spray and other forceful means to subdue those who

12  continued to fight.  Even after going down, some prisoners got up and attacked again.  In short,

13  chaos prevailed, lives were immediately in danger and the need for force, including the use of

14  rubber bullets cannot reasonably be questioned.  In his declaration, Rios asserts that he always

15  aimed below the waist, and while he did not see where each bullet went, he never saw any bullet

16  hit a prisoner in the head.  He also describes an incident in which a prisoner who was down

17  sprang up and attacked another prison, who turned out to be plaintiff.  Rios ordered the prisoner

18  down, the prisoner disobeyed and Rios shot at the attacker.  Plaintiff, however, ended up in the

19  medical clinic with a rubber-bullet wound to the head.

20        If Rios's account is true, he tempered the amount of force used, and was in fact trying to

21  rescue plaintiff from a violent attack by another inmate.  Plaintiff's having been hit in the head,

22  under Rios's account, was plainly not the result of an unconstitutional use of force.

23        Plaintiff, on the other hand, asserts in a verified complaint that after the riot he heard Rios

24  boasting about having shot a prisoner in the head.  While this suggests that Rios knew after the

25  fact that he shot someone in the head, another guard could have told Rios of this fact.  Plaintiff

26  also submits evidence that Rios laughed about having shot plaintiff.  This evidence is not

1   sufficient to create a genuine dispute over whether Rios deliberately shot plaintiff or any other

2   inmate in the head.  The evidence is clear that prisoners were rioting, inmates were moving

3   rapidly and chaotically and in large groups.  Rios's view at times was blocked, and Rios aimed

4   below the waist.  With the rapid movements of many inmates engaged in mutual combat with

5   some up, some on the ground, some falling, some getting up, it is not reasonable to infer that

6   because plaintiff was struck in the head by a rubber bullet that Rios was deliberately aiming for

7   that result.  Rios' reactions and comments after the riot are not evidence based upon which a jury

8   could find in plaintiff's favor.  Accordingly, Rios's motion must be granted.

9       **G. Qualified Immunity**

10      Defendants allege that they are entitled to qualified immunity.  There is no need to

11   consider the defense of qualified immunity with respect to the claims upon which the court has

12   resolved the summary judgment motion on the merits in favor of defendants.  *See Wilkie v.*

13   *Robbins*, 127 S.Ct. 2588, 2608 (2007).  Thus, the court only considers the defense of qualified

14   immunity with respect to the claims against Rendon, Baber, Acuna, Lemon and Bunnell which

15   remain for trial.

16      A motion for summary judgment based on the defense of qualified immunity is analyzed

17   under the ordinary framework established for such motions.  *Butler v. San Diego Dist. Attorney's*

18   *Office*, 370 F.3d 956, 963 (9th Cir. 2004).  A defendant who makes a properly-supported motion

19   for summary judgment based on the defense of qualified immunity shifts the burden such that

20   plaintiff must produce evidence in opposition.  *Butler*, 370 F.3d at 964.  Thus, in resolving

21   questions of qualified immunity on summary judgment, the court must decide whether, taking

22   the undisputed facts in the light most favorable to the non-moving party, it can be said that the

23   officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If,

24   and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask

25   whether the right was clearly established ... in light of the specific context of the case."  *Id*.

26   ////

1    Under the law and facts outlined above, the court finds that defendants are not entitled to

2    qualified immunity on either claim.

3              Defendants' argument in support of this defense is wholly conclusory.  They contend that

4    the undisputed facts show they did not violate plaintiff's constitutional rights, but if they did,

5    reasonable guards in the situation they confronted would not have realized that their conduct was

6    unlawful.  The court need not repeat here the analysis above as to why the key factual disputes

7    here must be resolved at trial.  However, after detailed consideration of the facts and law, the

8    court has found that there is a genuine dispute with respect to various claims.  Given the

9    conflicting evidence on this record, those same factual disputes preclude resolution of this prong

10   of qualified immunity on summary judgment.

11             The dispositive inquiry in the second prong of the analysis is whether it would be clear to

12   a reasonable guard that his conduct was unlawful in the situation he confronted.  *Saucier*, 533

13   U.S. at 205.  It is not necessary that the exact conduct be proscribed at the time of the acts

14   alleged.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Mendoza v. Block*, 27 F.3d 1357 (9th Cir.

15   1994).  Rather, the question is whether the "contours of the right" have been defined at a

16   sufficient level of specificity such that in light of the pre-existing precedent, the unlawfulness of

17   the conduct is apparent.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The law was clear

18   at the time of the events giving rise to this action that if prisons official "know[] of and

19   disregard[] an excessive risk to inmate health or safety" they violate a prisoner's Eighth

20   Amendment rights.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  It also was clear that prison

21   officials had the obligation "to protect prisoners from violence at the hands of other prisoners."

22   *Farmer*, 511 U.S. at 833.  For purposes of this motion, the court must take the facts in the light

23   most favorable to the plaintiff and draw all reasonable inferences in his favor.  *Saucier*, 533 U.S.

24   at 201.  The court finds that it is reasonable to infer from plaintiff's evidence that releasing the

25   Northern and Southern Hispanic prisoners separately and allowing them to congregate in large,

26   segregated groups resulted in the riot.  The question here is whether the defendants had "fair

1    notice that [their] conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  On

2    this question, the court considers the application of *Farmer* in *Robinson v. Prunty*, 249 F.3d 862,

3    866-67 (9th Cir. 2001).

4           In *Robinson*, the Ninth Circuit considered the question of qualified immunity with

5    respect to the rule announced in *Farmer*.  The plaintiff in *Robinson*, who was African-American,

6    alleged that prison guards knew that if they gave him yard time on a racially integrated yard,

7    plaintiff would be attacked.  *Robinson*, 249 F.3d at 863, 866.  Plaintiff alleged particular facts

8    showing that prison guards were aware that there was a serious risk of violence when they placed

9    prisoners of different races on the yard at the same time.  *Id.*, at 867.  Plaintiff submitted

10   evidence that he repeatedly was attacked while on a racially integrated yard, and that defendants

11   knew this.  *Id.*  He also submitted evidence that defendants made jokes about the potential for

12   violence on the yard before releasing the plaintiff and members of other races.  *Id.*  The Ninth

13   Circuit concluded that plaintiff's evidence demonstrated that defendants knew that there was a

14   risk of harm to the plaintiff if he was released to an integrated yard, and therefore could not have

15   believed that their conduct was lawful in light of pre-existing law.  *Id.*

16          Turning to the facts of this case, nothing about it suggests that Rendon, Acuna or Baber

17   would have believed that altering at the last minute the Warden's plan of operations for a

18   planned release from lockdown of a large number of rival gang members was lawful.  They all

19   knew the history of violence between the Northern and Southern Hispanics.  They all had

20   experience with releasing these groups from lockdown only to have the violence resume.  They

21   all disclaim any understanding of the reasoning behind the Warden's plan.  Thus, they had no

22   basis to weigh the relative merits of the Warden's plan against that of their own.  None adduces

23   any evidence that they had some particularized training that made them uniquely qualified to

24   ensure the safety of prisoners during release from lockdown. Thus, they had no expertise that

25   placed them in a position to substitute their judgment for that of the warden in handling what

26   they knew was a dangerous and potentially violent event involving large numbers of inmates.

1   Finally, no one informed the Associate Warden, Bunnell, of the change.  Bunnell was

2   anticipating an integrated release in which minor incidents of violence could be contained.

3   Without warning, Bunnell instead was faced with large, segregated groups of rival gangs who

4   quickly did what an experienced correctional officer at that prison could have reasonably

5   expected: they rioted.  Rendon, Acuna and Baber assert that they agreed that releasing the groups

6   as they did, i.e., through different exits and segregated by Northern/Southern affiliation, would

7   minimize the risk of violence as prisoners exited the building, which would be safer for

8   miscellaneous prison staff and for civilian workers.  Given the high risk of violence as the

9   lockdown ended, the lack of any reasoned penological justification for overriding the Warden's

10  decision, and the decision not to notify the Associate Warden who was then in charge of the

11  prison, no reasonable guard confronted with this situation would have believed that creating this

12  risk was lawful under the Eighth Amendment.

13          As with the claims against other defendants, the claims against Bunnell and Lemon for

14  failing to call down the yard sooner survive the first prong of the qualified immunity analysis

15  because there is a genuine dispute for trial as to the merits of those claims.  If plaintiff's

16  allegations are credited by the jury, he will have established a violation of his Eighth

17  Amendment rights under the applicable law.

18          With respect to the second prong, the same "clearly established" law applies.  The

19  question is thus whether Bunnell and Lemon would not have known under the circumstances

20  they faced that failing to call down the yard sooner than Bunnell did placed inmates at

21  unreasonable and unlawful danger.  Both these defendants knew that the process of releasing

22  prisoners was supposed to progress in a certain way in order to avoid large-scale violence.

23  Furthermore, both knew that the release was not proceeding as planned.  They observed as the

24  two rival gangs congregated on different parts of the yard, and as one group approached another.

25  It simply cannot be said that under the standard in *Farmer* they believed their conduct was

26  lawful.  These defendants are not entitled to qualified immunity.

1    Accordingly, it is hereby RECOMMENDED that:

2    1.  Defendant Lemon's June 4, 2007, motion for summary judgment be denied;

3    2.  Defendants Butler and Rios' May 30, 2007, motion for summary judgment be granted;

4    and,

5    3.  The other defendants' May 30, 2007, motion for summary judgment be granted in part

6    and denied in part as follows:

7    a.  Denied with respect to the claims against Rendon, Baber and Acuna;

8    b.  Denied with respect to the claim that Bunnell was deliberately indifferent by

9    failing to call down the yard sooner;

10    c.  Granted with respect to the claim that Bunnell was deliberately indifferent by

11    changing the plan for ending the lockdown.

12    These findings and recommendations are submitted to the United States District Judge

13    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

14    after being served with these findings and recommendations, any party may file written

15    objections with the court and serve a copy on all parties.  Such a document should be captioned

16    "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

17    within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

18    *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

19    Dated:  February 27, 2008.

20

21    EDMUND F. BRENNAN
      UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26